KNOLL, Judge.
Magnolia Life Insurance Company (Magnolia Life) appeals the trial court’s judgment in favor of Zula L. Deville, granting her life insurance proceeds under two life insurance policies issued to her late husband, Carice Deville, in the amounts of $5,000 and $2,000. Magnolia Life contends that the trial court erred in failing to find that Mr. Deville made material misrepresentations on his life insurance applications with the intent to deceive. The trial court denied Deville’s request for penalties under LSA-R.S. 22:656. Deville answered the appeal, asking us to reverse the trial court’s denial of penalties. We reverse.
Magnolia Life contends that the trial court erred in its determination that Magnolia Life failed to carry its burden of proving that Mr. Deville made material misrepresentations. Magnolia Life’s arguments are that the trial court: (1) erroneously concluded that Magnolia Life’s agent, Ernest Brown, failed to ask Mr. Deville the material health questions and received false answers provided from the insured; *636 (2) improperly weighed and appreciated the testimony of Ernest Brown; (3) based its decision on improper inferences from the testimony of Mrs. Deville and Ernest Brown; (4) improperly applied presumptions adverse to Magnolia Life because of its failure to call certain witnesses; and, (5) improperly inferred knowledge of Mr. De-ville's adverse medical condition to Magnolia Life without supporting evidence.
The trial court determined that Magnolia Life’s agent, Ernest Brown, never asked Mr. Deville the pertinent health questions. Accordingly, it never examined the medical evidence regarding Mr. Deville’s health pri- or to his applications for life insurance. Therefore, we will first address the issue of whether the trial court was manifestly erroneous in its determination of the factual issues involving that threshhold question.
From the outset, we reiterate the firmly established principle that an appellate court must give great weight to the conclusions of the trier of fact, and should not disturb reasonable evaluations of credibility and reasonable inferences of fact in the absence of manifest error. Laird v. Globe Life and Acc. Ins. Co., 503 So.2d 1107 (La.App. 3rd Cir.1987). Nevertheless, when the court of appeal finds that a reversible error of law or manifest error of material fact was made in the trial court, it is required to redetermine the facts de novo from the entire record and render a judgment on the merits. Rosell v. Esco, 549 So.2d 840 (La.1989).
In its oral reasons for judgment, the trial court stated:
“I believe that Mr. Brown in his zeal to sell that policy went up there and pretty well dictated a deal and couldn’t even read the questions. How could he have asked them? They wouldn’t have understood. He doesn’t even understand some of those questions himself.”
Brown testified that sometime in 1986 he approached Mr. and Mrs. Deville while they were paying a bill at Ardoin’s Funeral Home in Ville Platte, and asked them if they were interested in acquiring life insurance. The record then shows that on July 8, 1986, Brown went to Mr. Deville’s home in Carenero, and assisted Mr. Deville in completing an application for life insurance in the amount of $5,000. Brown testified that he asked Mr. Deville the various questions on the application, and that he (Brown) recorded Mr. Deville’s answers as they were given. He said he specifically asked Mr. Deville if he suffered from diabetes or if he ever had heart problems, and that Mr. Deville told him that he was in good health. After Brown obtained the necessary facts, Mr. Deville signed the application which contained language just above his signature as follows: “All statements and answers in this application are complete and true to the best of his or her knowledge and belief.”
Approximately one year later, Brown approached Mr. Deville about purchasing an additional life insurance policy in the amount of $2,000. The record shows that on August 26, 1987, Brown helped Mr. De-ville submit another application for insurance. Like before, Brown asked the questions, recorded Mr. Deville’s answers, and at the termination of the interview, Mr. Deville signed the application.
After carefully reviewing the record, we do not find that the evidence supports the trial court’s conclusion that Brown failed to question Mr. Deville about the particulars of his health. Although the testimony of Mrs. Deville, a witness to Brown’s interview, initially was that Brown asked no questions, she later stated, “Well, he [Brown] asked how we was and if we was sick or how old we was and all kind of things like that.” Moreover, the applications show that Brown questioned Mr. De-ville, because information is recorded on these forms which could only have been obtained by question and answer between Brown and the proposed insured. In the first application, Brown noted that Mr. De-ville was retired, that he had an earned monthly income of $1,100, that he was a smoker, that his family physician was Dr. Johnny Fruge in Sunset, and that he consulted Dr. Fruge in February 1986 for *637 treatment of the flu.[1] Furthermore, after the first application of insurance was obtained, Frank Marek, an emergency medical technician (EMT), also obtained a medical examiner’s report from Mr. Deville on July 17, 1986.[2] The EMT’s report shows that Mr. Deville responded negatively to questions about diabetes, emphysema, heart disease, and high blood pressure; in addition, information was recorded about Mr. Deville’s visit to Dr. Fruge in February 1986 (“Everything was fine.”), and specific statements were included that Mr. Deville’s two brothers died of heart attacks, one at age 54 and another at age 62. In the second application, Brown recorded that Mr. Deville smoked a pack of cigarettes per day, that he was taking the drug Marthritic since May 1987 after Dr. Fruge diagnosed that he suffered from arthritis, and that he was retired from the military with enough service time. On these facts, we find that the only inference that can be drawn is that Brown questioned Mr. Deville about his health. Therefore, we find that the trial court’s contrary conclusion was manifestly erroneous.
There is likewise no support for the trial court’s statement that even if the questions were asked, the Devilles would not have understood them. The evidence shows that the Devilles, though not well educated, are able to converse in French and English. Brown’s testimony was that he spoke in both languages with Mr. De-ville when he took Mr. Deville’s applications, and that he never got the impression that Mr. Deville did not understand the questions he posed. Dr. John Fruge, Mr. Deville’s family physician during the twenty years preceding death, testified that Mr. Deville was of average intelligence and understood the various conversations they had concerning his medical treatment over the years.
In a related issue directed to Brown, the trial court was critical of the fact that Brown was unable to pronounce the words “genito-urinary” which were found in the insurance applications. Even if this was so, this finding was immaterial since Mr. Deville had not suffered illnesses involving the genito-urinary tract. What was relevant was that Brown clearly understood and communicated the questions related to diabetes, abnormal blood pressure, and heart disease — all of which applied to Mr. Deville’s medical condition at the time the applications for life insurance were completed. Therefore, we find that the trial court was manifestly erroneous in its conclusion that Mr. Deville would not have understood the health questions posed because Brown could not read the questions properly.
In making its ruling on the threshhold issue of whether Brown asked the health questions contained in the application, the trial court also concluded that Magnolia Life’s failure to call Frank Marek, the EMT who examined Mr. Deville in connection with the first application for insurance, was presumed to be adverse to Magnolia Life. We disagree. Even if Marek should have been called by Magnolia Life, his testimony regarding the answers given by Mr. Deville would have been cumulative, since there was no variance in the responses to the health questions relevant to Mr. Deville’s health history, and his knowledge thereof.
We now turn our attention to the trial court’s determination that Brown’s testimony was biased, since he received a commission on the new life insurance policies he sold. In assessing Brown’s testimony, the trial court stated:
*638 “Here is the agent ... He’d been working only a couple of years. His main part of his zeal is to sell that insurance and to get the premium to get his check.”
Although a witness’ bias or interest may be considered in weighing the testimony, we find that the trial court over emphasized the impact that such may have had on the testimony involved. The combined monthly premiums collected on these two applications totaled $34.20. When viewed in light of the totality of the evidence, we cannot say that Brown’s interest so colored his testimony as to discredit it. In reaching this conclusion, we note that Brown forthrightly answered questions posed by the trial court about how he earned his commissions, and no further evidence was adduced on the issue of Brown’s credibility.
The trial court next focused on the question of whether or not Magnolia Life should have suspected that Mr. Deville’s health was not what he stated. In concluding this question adverse to Magnolia Life, the trial court relied upon the application’s designation that the Deville’s household income per month totaled $1,100 which was derived from military retirement and Mrs. Deville’s social security. There was no evidence that Magnolia Life had any knowledge of Mr. Deville’s particular military background or that this income figure was grossly out of line. The trial court’s statement, “[Mr. Deville would] ... almost have to be a colonel to get that type of retirement,” is outside the record. We find that the trial court was manifestly erroneous in considering this factor in the evaluation of this matter, since there was no evidence to support its application to the issues presented. In addition, the trial court said that since Mr. Deville smoked and was overweight, Magnolia Life should have made further inquiry. This analysis begs the question. As pointed out by the trial court, if Magnolia Life had known of Mr. Deville’s poor health it would not have issued these policies. The applications for insurance were the primary means by which Magnolia Life was to learn of Mr. Deville’s health. Accordingly, we cannot say that Magnolia Life should now be es-topped from questioning the status of Mr. Deville’s health at the time he applied for insurance coverage because of these facts.
Having found that the trial court’s ruling was manifestly erroneous, we now must examine the record evidence to determine whether the circumstances of this case create a reasonable assumption that Mr. Deville recognized the materiality of the false statements and that he made those statements in the application with an intent to deceive.
The law relative to the defense of material misrepresentation as it affects an insurer’s liability for payment under its policy of insurance was well capsulized in Jamshidi v. Shelter Mut. Ins. Co., 471 So.2d 1141 (La.App. 3rd Cir.1985), and will not be repeated herein.
Magnolia Life introduced a mass of medical evidence comprised of: (1) reports and medical information from the Veteran’s Administration dating from 1953; (2) findings of the Social Security Administration and medical reports relative to various disability claims lodged by Mr. Deville commencing with October 18, 1983; (3) medical records from Lafayette General Hospital and University Medical Center; (4) the deposition of Dr. John Fruge, Mr. Deville’s treating physician since the 1960’s.
Dr. John Fruge, a family practitioner, treated Mr. Deville since the mid-1960s. Dr. Fruge testified that he first diagnosed that Mr. Deville suffered from diabetes in July 1970. Initially, Mr. Deville was treated with an oral type of medication, but as time progressed his diabetes required treatment with daily insulin injections. On September 1, 1976, Dr. Fruge diagnosed Mr. Deville’s hypertension, and prescribed Hyg-roton to lower the blood pressure. In addition, he urged Mr. Deville to reduce his weight (approximately 260 pounds for a person who was 5 feet 6V2 inches tall), and decrease his consumption of salt. In the late 1970s, Dr. Fruge also diagnosed that Mr. Deville suffered from emphysema.
From February 3, 1981, to February 13, 1981, Mr. Deville was admitted to the Veterans Administration Hospital where he *639 was treated for diabetes, obesity, degenerative joint disease, and anxiety neurosis. On November 6, 1981, Mr. Deville was admitted to Lafayette General Hospital for severe chest pain. Testing showed that he suffered an acute myocardial infarction. After his heart attack, Dr. Pruge testified that Mr. Deville had a history of angina-type chest pain which was treated at various times with Nitroglycerin dosages administered orally.
In addition, the evidence shows that at various times between 1953 and 1986, Mr. Deville either applied for and/or received disability compensation from the Veterans Administration and the Social Security Administration for his respiratory problems, heart disorders, diabetes, and arthritis. To support his claims at various times during these periods, the record also reflects that Mr. Deville corresponded with Senator Russell Long, and provided numerous written statements to the Veteran’s Administration and the Social Security Administration about his various illnesses. As late as September 15,1986, Mr. Deville signed a Social Security form stating, “I get chest pains, I have hard times breathing; I can’t hardly walk at times — causes me to drag my right leg. The chest pain is continuous — I’ve had two heart attacks. I get numb in my hands and legs.” Less than two months prior to this statement, namely, on July 17, 1986, Mr. Deville applied for the first of the life insurance policies contested herein, denying that he had any medical problems.
Mr. Deville died in Ville Platte, Louisiana on February 27, 1988. The immediate cause of death was listed on his death certificate as cardio-respiratory arrest due to ischemic cardiomyopathy and diabetes mellitus.
After carefully reviewing the record evidence, we find that Magnolia Life proved by a preponderance of the evidence that Mr. Deville fraudulently misrepresented the status of his health when he applied for life insurance with Magnolia Life with the intent to deceive. Furthermore, considering Mr. Deville’s medical history and his cause of death, we also find that his misstatements materially affected the risk assumed by the insurer. Therefore, we find that Mr. Deville’s beneficiary is not entitled to receive the benefits provided in the two Magnolia Life insurance policies issued on July 17, 1986, and September 15, 1987. Instead, Mrs. Deville’s recovery is limited to the two checks Magnolia Life issued to her on April 26, 1988, as reimbursement for the amount of premiums paid.
For the foregoing reasons, the judgment of the trial court is reversed and set aside. IT IS ORDERED, ADJUDGED, AND DECREED that there be judgment in favor of Magnolia Life Insurance Company and against Zula Deville, dismissing her petition with prejudice. Costs of trial and appeal are assessed to Zula Deville.
REVERSED AND RENDERED.

. The trial court never looked at the substantial medical evidence presented by Magnolia Life, since it found that Magnolia Life failed to prove that Mr. Deville acted with any intent to deceive. We will elaborate on the medical evidence later in this opinion.

. Although Frank Marek did not testify at trial, as discussed more fully hereinbelow, Deville did not object to the inclusion of his report as part of the policy which was introduced into evidence. In fact, Deville used Marek’s report in its case-in-chief. Even though Mrs. Deville testified that Marek did not question Mr. Deville about the various illnesses shown on the application, we may refer to it because it is made part of the evidence, and the inclusion of this additional information on the report is certainly relevant to the threshhold question of whether Mr. Deville was asked about the status of his health.